IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT BASSETT, et al.,<br><br><br><br>Plaintiffs,<br><br>vs.<br><br>MICHAEL RUGGLES, et al.,<br><br>Defendants. | No. CV-F-09-528 OWW/SMS<br><br>MEMORANDUM DECISION AND ORDER GRANTING IN PART WITH PREJUDICE, GRANTING IN PART WITH LEAVE TO AMEND, AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT (Docs. 61 & 66) AND DENYING DEFENDANT FLAGSTAR'S MOTION TO STRIKE (Doc. 66) |

Before the Court are Defendants Michael Ruggles ("Ruggles") and Flagstar Bank's ("Flagstar") motions to dismiss the Second Amended Complaint ("SAC"), and Flagstar's motion to strike portions of the SAC.[1]

This action was commenced on January 26, 2009 in the Fresno County Superior Court.  The action was removed to this Court on

---

[1]No appearance was made at the hearing on behalf of Defendant Ruggles.

1

March 19, 2009.  Plaintiffs then filed a First Amended Complaint. The SAC was filed pursuant to the Memorandum Decision filed on September 14, 2009 ("September 14 Memorandum Decision"), granting in part and denying part Defendants' motions to dismiss and to strike.  The caption of the SAC names as Defendants, Ruggles and Flagstar.  Also named as defendants in the body of the SAC are Infinity Group Services ("IGS"), a California Corporation licensed to engage as a broker of home loans, and Kahram Zamani ("Zamani"), alleged to be a licensed California mortgage broker and the broker of record for IGS.  Both IGS and Zamani are alleged to have filed for bankruptcy.  Ruggles is alleged to be a licensed California real estate agent who acted in the course and scope of his employment with Zamani and IGS.  Flagstar is alleged to be a banking institution.  The SAC alleges on information and belief that "in doing the things alleged herein, each of the Defendants was either an agent or representative of the other Defendants and/or is responsible in some way for the damages and/or conduct herein alleged."  As "General Allegations," the SAC alleges:

> 8.   The Bassetts are informed and believe and on that basis allege that IGS was originally established as a broker of residential mortgages.  IGS was not established to act as a lender for residential mortgages.  IGS does not service residential mortgages and at all times relevant, IGS was not capable of servicing residential mortgages.
>
> 9.   Prior to the close of the Bassetts' mortgage as described below, IGS and Flagstar entered into a contractual relationship regarding the sale of mortgages.  For the

purpose of avoiding the statutory disclosure
requirements, IGS and Flagstar concocted a
scheme by which IGS would identify itself as
the lender on residential mortgages although
Flagstar was actually acting as the lender.
Under the scheme, Flagstar would provide the
funding to IGS in advance of the loan
closing.  Flagstar would control every aspect
of the loan approval and development process.
Flagstar would establish the terms and
conditions of the loan.  Flagstar would
commit to fund the loan prior to closing.
Flagstar would order the appraisal and
oversee all income verification, insurance
verification, employment verification and
other matters related to the loan approval.
Flagstar would create the loan number and
draft all loan documents.  Flagstar would
cause itself to be the original recipient of
all deeds of trust immediately after
recording.  On or after the loan closing, IGS
would immediately transfer the loan to
Flagstar.  IGS would not and could not
service any of the loans for any period.

10.  By virtue of the scheme between Flagstar
and IGS, IGS was able to market itself to
potential residential mortgage consumers
claiming that it would obtain mortgages for a
flat fee of less than $1,000.  IGS and
Flagstar did not disclose to the potential
customers at any time that Flagstar would
secretly pay a kickback to IGS of several
thousand dollars when IGS tricked the
potential customers into signing loan
documents for above par loans.

11.  In 2006, the Bassetts were interested in
buying a home in Fresno, California.  The
Bassetts located a home to purchase at 2770
W. Locust, Fresno, California ('the
Property').

12.  In late 2006, in order to finance the
purchase of the Property, the Bassetts
contacted IGS for help in securing financing
for the Property.  IGS and Zamani agreed to
serve the Bassetts in a fiduciary capacity as
real estate brokers.  The Bassetts discussed
a loan with Michael Ruggles, an employee of
IGS and an authorized representative of both

IGS and Zamani.  Ruggles prepared a loan application for the Bassetts on or about November 29, 2006.

13.  Also on or about November 29, 2006, Ruggles provided the Bassetts with various documents including a Good Faith Estimate ('GFE').  On the GFE, Ruggles identified IGS as the loan broker and indicated that IGS would not be paid any additional compensation by the lender.  The GFE also indicated that IGS had not yet obtained a lender.

14.  Ruggles also provided the Bassetts with a document titled 'Real Estate Agency Disclosure' in which IGS identified itself as a licensed real estate brokerage.  In the document, IGS states that it is the Bassetts' agent in this transaction and that it owes the Bassetts a fiduciary duty.

15.  At approximately the same time, representatives of IGS contacted Flagstar about the Bassetts' loan application.  The Bassetts are informed and believe that IGS forwarded all documents to Flagstar that were provided to the Bassetts by IGS.

16.  By no later than December 6, 2006, Flagstar assumed total control of the creation of the Bassetts' loan and the terms of the loan.  On or about December 6, 2006, Flagstar provided IGS underwriting findings which included a Flagstar loan number, terms and conditions of lending, and various findings regarding the interest of Flagstar on the loan.  Through the underwriting findings and in conjunction with the scheme Flagstar agreed that as long as certain conditions and terms were met, Flagstar would fund the loan.

17.  By no later than December 6, 2006, Flagstar began dictating to IGS what documents would be provided to the Bassetts and all other terms and conditions that must be met before the loans could be funded.

18.  On or about December 14, 2006, in the course and scope of his employment and with the authorization of IGS, Zamani, and

4

Flagstar, Ruggles told the Bassetts that their loan was not approved, but that alternate financing could be found.  Ruggles told the Bassetts that the loans he had obtained for them would be financed at a fixed rate of approximately 4%, and that the total monthly payments due on the loans would be approximately $2,100.00.  Ruggles told the Bassetts that their loan carried a prepayment penalty provision of only 24 months.

19.  Based on these representations of Ruggles, the Bassetts were persuaded to enter into the loans IGS had obtained for the Bassetts.

20.  Prior to the close of the loan, Flagstar obtained an appraisal of the Property.

21.  On December 21, 2006, Flagstar prepared a Wholesale Commitment Letter on Flagstar letterhead directed to 'Dear Robert D. Bassett' in which Flagstar identified 20 conditions that must be met to the satisfaction of Flagstar before loan number 501291396 could close.

22.  Flagstar directed the preparation of the loan documents including the deeds of trust. Flagstar directed that all deeds of trust be sent to Flagstar's corporate offices immediately after recording.

23.  The loans closed on or about December 21, 2006 with funds provided by Flagstar to IGS.  Zamani was the broker of record for the transaction.  Certain of the closing documents including the HUD-1 Settlement Statement and the settlement statement identify Flagstar as the lender on the loans and the drafter of the loan documents.  IGS is identified as the broker for the loans.

24.  The loans were made in the amounts of $388,000.00 and $97,000.00, respectively. Contrary to the representations of Ruggles, the larger loan is a negative amortization adjustable rate loan.  The larger loan has an initial interest rate of 7.125%, which is scheduled to increase sharply beginning in 2012.  The initial monthly payment amount is

5

$1,333.75.  The loan contains a prepayment penalty provision of 36 months.

25.  The smaller loan is a fixed rate loan with an interest rate of 8.75%.  The monthly payment amount is $753.10.

26.  In order to further their scheme of defrauding the Bassetts, Flagstar prepared the promissory note with IGS identified as the Lender.  However, after Robert Bassett executed the note and it was notarized, outside of Robert Bassett's presence, Flagstar added 'Pay to the order of Flagstar Bank, FSB without recourse' to the note and Flagstar had IGS president and CEO, Zamani sign the conveyance.  Flagstar did not provide a copy of the note with the above conveyance language to the Bassetts.

27.  Prior to the close of the loan, Flagstar agreed to pay IGS the following yield spread premiums: $8,163.52 as a premium on the loan in the amount of $388,000 and $970 as a premium on the loan in the amount of $97,000.

28.  Prior to the close of the loans, Flagstar agreed to pay IGS the premiums because the loan terms include higher interest rates than what the Bassetts otherwise qualified for and because one of the loans includes a prepayment penalty.

29.  On December 28, 2006, Flagstar paid the premiums to IGS.

30.  At all times, Flagstar knew that IGS did not and would not disclose to the Bassetts the premiums Flagstar agreed to pay IGS unless Flagstar directed IGS to disclose the premiums.  Flagstar intended to conceal the premiums from the Bassetts and not to disclose the premiums at any time unless ordered to do so by a Court.

31.  Flagstar and IGS agreed amongst themselves to have the yield spread premium paid outside of the escrow so that the Bassetts would not discover it.  Defendants conspired together to actively conceal, and continue to conceal, evidence of the

existence of the yield spread premium from
the Bassetts.

32.   The Bassetts had no actual or
constructive knowledge of the yield spread
premium at closing because Flagstar and IGS
intentionally hid the yield spread premium
from the Bassetts.

33.   The Bassetts first suspected a yield
spread premium existed in or about November
2008 when they contacted their attorney,
Matthew Bradford, and asked him to review the
loan documents from the loan transaction.

34.   No document provided to the Bassetts
with regard to their loans discloses any
payment made by Flagstar to IGS.

35.   On November 26, 2008, Bradford sent a
letter to Flagstar requesting documentation
which would confirm whether Flagstar had paid
a yield spread premium to IGS in connection
with the Bassetts' loan transaction.
Bradford included with the letter an
authorization for release of information
signed by the Bassetts.

36.   On November 26, 2008, Bradford also sent
the attorney for IGS a letter requesting
documentation which would confirm whether IGS
had received a yield spread premium from
Flagstar in connection with the Bassetts'
loan transaction.  Bradford included with the
letter an authorization for release of
information signed by the Bassetts.

37.   On or about December 12, 2008, Bradford
received a letter from Flagstar indicating
that although it would provide certain
documentation, it would not provide
information about payments made by Flagstar
to IGS without a 'discovery order.'

38.   On December 19, 2008, Bradford sent
Flagstar a letter indicating that by refusing
to produce documents that could exonerate
Flagstar of liability under RESPA or other
claims, Flagstar was impliedly admitting to
wrongdoing.  Bradford stated in the letter
that if he was not provided with the

7

> requested documents by December 29, 2008, he
> would proceed with litigation and seek the
> documents through litigation.
>
> 39.  On January 7, 2009, Bradford received a
> letter from Flagstar reiterating that it
> would not produce the requested documents
> without a discovery order.
>
> 40.  On January 28, 2009, Bradford sent a
> letter to Flagstar stating that, as a result
> of Flagstar's failure to produce documents,
> the Bassetts had filed the instant action in
> Fresno County Superior Court against Flagstar
> and other defendants.

The First and Second Causes of Action are for fraud against Ruggles; the Third Cause of Action is for fraud against Ruggles and Flagstar; the Fourth Cause of Action is for breach of fiduciary duty against Ruggles; the Fifth Cause of Action is for conspiracy to breach fiduciary duties against Ruggles and Flagstar; the Sixth Cause of Action is for violation of 12 U.S.C. § 2807 against Ruggles and Flagstar; the Seventh Cause of Action is for violation of 15 U.S.C. § 1601 against Ruggles and Flagstar; the Eighth Cause of Action is for professional negligence against Ruggles; the Ninth Cause of Action is for unfair business practices within the meaning of California Business and Professions Code § 17200 *et seq.* against Ruggles and Flagstar.

A.  <u>MOTIONS TO DISMISS</u>.

1.  <u>Governing Standards</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  Dismissal is warranted under Rule 12(b)(6)

8

where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.*, 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 555. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The

9

plausibility standard is not akin to a "probability requirement,'
but it asks for more than a sheer possibility that a defendant
has acted unlawfully, *Id.* Where a complaint pleads facts that
are "merely consistent with" a defendant's liability, it "stops
short of the line between possibility and plausibility of
'entitlement to relief.'" *Id.* at 557.  In *Ashcroft v. Iqbal*, ___
U.S. ___, 129 S.Ct. 1937 (2009), the Supreme Court explained:

> Two working principles underlie our decision
> in *Twombly*.  First, the tenet that a court
> must accept as true all of the allegations
> contained in a complaint is inapplicable to
> legal conclusions.  Threadbare recitations fo
> the elements of a cause of action, supported
> by mere conclusory statements, do not suffice
> ... Rule 8 marks a notable and generous
> departure from the hyper-technical, code-
> pleading regime of a prior era, but it does
> not unlock the doors of discovery for a
> plaintiff armed with nothing more than
> conclusions.  Second, only a complaint that
> states a plausible claim for relief survives
> a motion to dismiss ... Determining whether a
> complaint states a plausible claim for relief
> will ... be a context-specific task that
> requires the reviewing court to draw on its
> judicial experience and common sense ... But
> where the well-pleaded facts do not permit
> the court to infer more than the mere
> possibility of misconduct, the complaint has
> alleged - but it has not 'show[n]' - 'that
> the pleader is entitled to relief.' ....
>
> In keeping with these principles, a court
> considering a motion to dismiss can choose to
> begin by identifying pleadings that, because
> they are no more than conclusions, are not
> entitled to the assumption of truth.  While
> legal conclusions can provide the framework
> of a complaint, they must be supported by
> factual allegations.  When there are well-
> pleaded factual allegations, a court should
> assume their veracity and then determine
> whether they plausibly give rise to an
> entitlement to relief.

1    Immunities and other affirmative defenses may be upheld on

2  a motion to dismiss only when they are established on the face of

3  the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th

4  Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th

5  Cir. 1980).  When ruling on a motion to dismiss, the court may

6  consider the facts alleged in the complaint, documents attached

7  to the complaint, documents relied upon but not attached to the

8  complaint when authenticity is not contested, and matters of

9  which the court takes judicial notice.  *Parrino v. FHP, Inc*, 146

10  F.3d 699, 705-706 (9th Cir.1988).

11        2.  <u>Sixth Cause of Action for Violation of RESPA, 12</u>

12  <u>U.S.C. § 2608</u>.

13    Defendants move to dismiss the Sixth Cause of Action for

14  violation of the Real Estate Settlement Procedures Act,

15  ("RESPA").

16    After incorporating Paragraphs 1-40, the Sixth Cause of

17  Action alleges:

18        77.  In doing the things alleged herein,
         Flagship acted as a federally insured lender.
19
         78.  The loan papers that Ruggles, Zamani,
20       and IGS fraudulently induced the Bassetts to
         execute, constituted 'federally-related
21       mortgage loans' within the meaning of 12
         U.S.C. section 2602, subparagraph 1.
22
         79.  In doing the things alleged herein,
23       Ruggles, Zamani and IGS offered the Bassetts
         'settlement services' within the meaning of
24       12 U.S.C. section 2602, subparagraph 3.

25        80.  The Bassetts are informed and believe
         that IGS, and/or an employee of IGS, received
26       an illegal yield spread premium for referring

11

the Bassetts' federally-related mortgage loan to Flagstar.  The Bassetts are informed and believe that Flagstar and IGS agreed amongst themselves to have the yield spread premium paid outside of the escrow so that the Bassetts would not discover it.  The Bassetts are informed and believe that defendants actively concealed, and continue to conceal, evidence of the existence of the yield spread premium from the Bassetts.

...

82.  The yield spread premium paid by Flagstar to IGS constituted an illegal, unearned fee in violation of 12 U.S.C. section 2607 because the yield spread premium was not disclosed to the Bassetts prior to the closing of the loan and it did not represent payment for services actually performed nor was it reasonably related to the value of goods or services received by the Bassetts.

83.  The premium paid by Flagstar to IGS was payment to IGS solely for the fact that IGS tricked the Bassetts into signing loan documents for loans with higher interest rates than what the Bassetts qualified for and for including a prepayment penalty on one of the loans.  No aspect of the premium payment represented any service rendered to the Bassetts.

84.  At closing the Bassetts paid IGS separately for every service it may have provided including the following: Processing Fee $1,075, Funding Fee $650, Flood Certificate Fee $30, Document Fee $75, Administration Fee $400, Appraisal Review Fee $100, VOE fee $13.00.

85.  The premium paid by Flagstar to IGS was also illegal because it was not reasonably related to the value of goods or services rendered because no actual goods or services were rendered for the premium payment.

86.  In doing the things alleged herein, the Defendants caused the Bassetts to incur excessive costs and fees, to pay unearned

> fees, and to be parties to a transaction that included illegal kickbacks and/or referral fees.

In enacting RESPA, the Congress found "that significant reforms in the real estate settlement process are needed to insure that consumers ... are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices ...." 12 U.S.C. § 2601(a). The purpose of RESPA was to effect certain changes in the settlement process that will result, *inter alia,* "in more effective advance disclosure to home buyers and sellers of settlement costs" and "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(1) & (2). 12 U.S.C. § 2607(a) provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally regulated mortgage loan shall be referred to any person.

Section 2607(c) provides:

> Nothing in this section shall be construed as prohibiting ... (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed, ... (4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or

13

range of charges generally made by the
provider to whom the person is referred (i)
in the case of a face-to-face referral or a
referral made in writing or by electronic
media, at or before the time of the referral
(and compliance with this requirement in such
case may be evidenced by a notation in a
written, electronic, or similar system of
records maintained in the regular course of
business); (ii) in the case of a referral
made by telephone, (and in such case an
abbreviated verbal disclosure of the
existence of the arrangement and the fact
that a written disclosure will be provided
within 3 business days shall be made to the
person being referred during the telephone
referral); or (iii) in the case of a referral
by a lender (including a referral by a lender
to an affiliated lender), at the time the
estimates required under section 2604(c) of
this title are provided (notwithstanding
clause (i) or (ii); and any required written
receipt of such disclosure (without regard to
the manner of the disclosure under clause
(i), (ii), or (iii) may be obtained at the
closing or settlement (except that a person
making a face-to-face referral who provides
the written disclosure at or before the time
of the referral shall attempt to obtain any
required written receipt of such disclosure
at such time and if the person being referred
chooses not to acknowledge the receipt of
such disclosure at that time, that fact shall
be noted in the written, electronic, or
similar system of records maintained in the
regular course of business by the person
making the referral), (B) such person is not
required to use any particular provider of
settlement services, and (C) the only thing
of value that is received from the
arrangement, other than the payments
permitted under this subsection, is a return
on the ownership or franchise relationship
....

As stated in *Schuetz v. Banc One Mortgage*, 292 F.3d 1004

(9th Cir.2003), *cert. denied*, 537 U.S. 1171 (2004):

A yield spread premium, or 'YSP,' is a lump
sum paid by a lender to a broker at closing

14

when the loan originated by the broker bears
an above-par interest rate.  As HUD has
explained it:

> Payments to brokers by lenders,
> characterized as yield spread
> premiums, are based on the interest
> rate and points of the loan entered
> into as compared to the par rate
> offered by the lender to the
> mortgage broker for that particular
> loan (e.g., a loan of 8% and no
> points where the par rate is 7.50%
> will command a greater premium for
> the broker than a loan with a par
> rate of 7.75% and no points).  In
> determining the price of a loan,
> mortgage brokers rely on rate
> quotes issued by lenders, sometimes
> several times a day.  When a lender
> agrees to purchase a loan from a
> broker, the broker receives the
> then applicable pricing for the
> loan based on this difference
> between the rate reflected in the
> rate quote and the rate of the loan
> entered into by the borrower ....
>
> Lender payments to mortgage brokers
> may reduce the up-front costs to
> consumers.  This allows consumers
> to obtain loans without paying
> direct fees themselves.  Where a
> broker is not compensated by the
> consumer through a direct fee, or
> is partially compensated through a
> direct fee, the interest rate of
> the loan is increased to compensate
> the broker or the fee is added to
> principal.  In any of these
> compensation methods described, all
> costs are ultimately paid by the
> consumer, whether through direct
> fees or through the interest rate.

1999 Statement of Policy, 44 Fed.Reg. at
10081 (footnotes omitted).

*Id.* at 1007-1008; *see also Bjustron v. Trust One Mortgage Corp.*,
322 F.3d 1201, 1204 n. 2 (9th Cir.2003):

15

> A yield spread premium (YSP) is a payment
> made by a lender to a mortgage broker in
> exchange for that broker's delivering a
> mortgage ready for closing that is at an
> interest rate above the par value of the loan
> being offered by the lender.  The YSP is the
> difference between the par rate and the
> actual rate of the loan; this difference is
> paid to the broker as a form of bonus.  A YSP
> is typically a certain percentage of the loan
> amount; therefore, the higher the loan is
> above par value, the higher the YSP paid the
> mortgage broker.

Compensation in the form of yield spread premiums is not per se

illegal or legal.  *See Geraci v. Homestreet Bank*, 347 F.3d 749,

751 (9th Cir.2003).  The Ninth Circuit has adopted the HUD

regulations' two-part test for determining whether yield spread

premiums violate the kickback provisions of RESPA.  *See Schuetz*

*v. Banc One Mortgage Corp.*, *supra*, 292 F.3d at 1012.  Under the

HUD test, "'the first question is whether goods or facilities

were actually furnished or services were actually performed for

the compensation paid .... The second question is whether the

payments were reasonably related to the value of the goods or

facilities that were actually furnished or services that were

actually performed.' 66 Fed.Reg. at 53054."  *Manganallez v.*

*Hilltop Lending Corp.*, 505 F.Supp.2d 594, 603 (N.D.Cal.2007).

   To the extent the Sixth Cause of Action alleges a violation

of RESPA because of failure to disclose the alleged yield spread

premium, Defendants argue that Plaintiffs have not stated a

claim.  Defendants refer to the September 14 Memorandum Decision:

> The fact of a premium is not *ipso facto* a
> violation of RESPA.  It is only a violation
> if Plaintiffs satisfy the two-part test,

16

> i.e., whether goods or facilities were
> actually furnished or services were actually
> performed for the compensation paid and
> whether the payments were reasonably related
> to the value of the goods or facilities that
> were actually furnished or services that were
> actually performed.  Failure to disclose a
> yield spread premium may be a violation of
> TILA, ... but does not appear to be an
> element of a claim for violation of RESPA.

12 U.S.C. § 2604(c) provides that "[e]ach lender shall include

with the booklet a good faith estimate of the amount or range of

charges for specific settlement services the borrower is likely

to incur in connection with the settlement as prescribed by the

Secretary."   However, Section 2604(c) does not authorize a

private remedy.  *See Pagtalunan v. Reunion Mortg. Inc.*, 2009 WL

961995 at *3 (N.D.Cal., April 8, 2009):

> Plaintiffs' fourth cause of action is for a
> violation of RESPA and its implementing
> regulation for Defendants' failure to provide
> the proper disclosures as required by RESPA.
> The only specific allegation of nondisclosure
> under RESPA is Defendants' failure to provide
> the yield spread premium in the Good Faith
> Estimate and Truth in Lending Disclosure ...
> Plaintiffs do not challenge the propriety of
> the yield spread premium.  Rather they allege
> that the amount of that premium was not
> disclosed.  However, while 12 U.S.C. §
> 2604(c) of RESPA requires each lender to
> provide the borrower with a good faith
> estimate of the amount or range of charges
> for specific settlement services the borrower
> is likely to incur, that provision does not
> explicitly authorize a private remedy, in
> contrast with other provisions of the
> statute.  *See, e.g., Collins v. FMHA-USDA*,
> 105 F.3d 1366, 1367 (11th Cir. Fla.
> 1997)(noting Congress' intent to eliminate a
> private right of action).  Plaintiffs' RESPA
> claim based on the yield spread premium is
> dismissed with prejudice.  Plaintiffs may
> only amend if they can make good faith

17

1                        **allegations supporting a different viable**

                       **RESPA claim under other provisions of the**

2                        **statute.**

3      **Plaintiffs failed to respond to this ground for dismissal of**

4 **the Sixth Cause of Action in their written opposition.  At the**

5 **hearing, however, Plaintiffs asserted "2607(c) provides that**

6 **disclosure must be made where certain circumstances – and in**

7 **certain circumstances in which fees are permissible.  There was**

8 **no – absolutely no disclosure of any kind in this case."**

9 **Plaintiffs further asserted at the hearing: "But the yield spread**

10 **premium did not represent payment for any services whatsoever.**

11 **Nor was it disclosed.  The Bassett[s] were charged twice."**

12      **Plaintiffs' assertions are without merit.  The SAC alleges**

13 **that the yield spread premium was not disclosed.  Nothing in**

14 **Section 2607(c) requires disclosure of a yield spread premium,**

15 **which as case law establishes, is a term of art.  Plaintiffs**

16 **cannot rely on Section 2604(c) because that statute does not**

17 **provide a private remedy.**

18      **Defendants' motion to dismiss the Sixth Cause of Action is**

19 **GRANTED and the Sixth Cause of Action is DISMISSED WITH PREJUDICE**

20 **to the extent it is based on the failure to disclose the alleged**

21 **yield spread premium.**

22      **Defendants move to dismiss the Sixth Cause of Action to the**

23 **extent it alleges that Flagstar violated RESPA by making payments**

24 **to IGS of $8,163.52 and $970 which did not represent payment for**

25 **services actually performed and were not reasonably related to**

26 **the value of goods or services received by the Bassetts.  (SAC,**

¶¶ 27, 82).  Defendants refer to the allegation in Paragraph 83 that "[t]he premium paid by Flagstar to IGS was payment to IGS solely for the fact that IGS tricked the Bassetts into signing loan documents for loans with higher interest rates than what the Bassetts qualified for and for including a prepayment penalty on one of the loans" and that "[n]o aspect of the premium payment represented any service rendered to the Bassetts."  Defendants assert that this allegation is conclusory and self-serving and is belied by other allegations in the SAC, i.e., that "[t]he Bassetts discussed a loan with Michael Ruggles," "Ruggles prepared a loan application for the Bassetts," "Ruggles provided the Bassetts with various documents including a Good Faith Estimate" and a "Real Estate Agency Disclosure," "[R]epresentatives of IGS contacted Flagstar about the Bassetts' loan application" and "forwarded all documents to Flagstar," "Ruggles told the Bassetts that their loan was not approved, but that alternate financing could be found," "Ruggles told the Bassetts that the loans he had obtained for them would be financed at a fixed rate of approximately 4%, and that the total monthly payments would be approximately $2,100.00" and that "their loan carried a prepayment penalty provision of only 24 months."  Defendants contend that these allegations satisfy at least six of the list of compensable services set forth in the Real Estate Settlement Procedures Act Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10080, 10085 (March 1, 1999)("HUD Policy Statement"), and therefore

19

satisfy the first prong of the two-part test.

Under the first prong on the two-part test, HUD considers payments to a mortgage broker justified if the broker takes the application information and performs at least five additional services pecified in HUD's list as compensable services. *See Reyes v. Premier Home Funding, Inc.*, 640 F.Supp.2d 1147, 1159 (N.D.Cal.2009). HUD's list of compensable services includes (a) taking information from the borrower and filling out the application; (b) analyzing the borrower's income and debt and pre-qualifying him to determine the maximum mortgage that he can afford; (c) educating the borrower in the home buying and financing processes, advising him about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product; (d) collecting financial information such as tax returns, bank statements, and other related documents that are part of the application process; (e) initiating/ordering verifications of employment and verifications of deposit; (f) initiating/ordering requests for mortgage and other loan verifications; (g) initiating/ordering appraisals; (h) initiating/ordering inspections or engineering reports; (i) providing disclosures (truth in lending, good faith estimate, others) to the borrower; (j) assisting the borrower in understanding and clearing credit problems; (k) maintaining regular contact with the borrower, realtors, and lender between application and closing; (l) ordering legal documents; and (n) participating in the loan closing. *Id.* at 1159 n.7.

1    Plaintiffs respond that the SAC complies with Rule 8 and

2    that Defendants ask the Court to disregard the pleading in favor

3    of contrary inferences drawn by Defendants.   Plaintiffs assert:

4         Flagstar asks this Court to rule that where
          it can be inferred from the pleading that a
5         broker performed any amount of service, then
          there can be no RESPA violation for a yield
6         spread premium.   However, no case supports
          Flagship's motion to dismiss on this ground.

7

8    Defendants reply that the two-prong test is disjunctive,

     i.e., that RESPA is not violated if either of the prongs is not
9
     satisfied.   In so arguing, Defendants cite *Rendon v. Countrywide*
10
     *Home Loans, Inc.*, 2009 WL 3126400 at *8 (E.D.Cal., Sept. 24,
11
     2009), wherein Judge O'Neill ruled:
12
          A yield spread premium violates RESPA when it
13        is paid to a mortgage broker who provides no
          good or services in connection with the loan
14        transaction or when the yield spread premium
          is unreasonably high in relation to the goods
15        and services provided by the mortgage broker.
          *See Lane v. Residential Funding Corp.*, 323
16        F.3d 739, 743 (9th Cir.2003); *Bjustrom v.*
          *Trust One Mortg. Corp.*, 322 F.3d 1201, 1206-
17        1207.

18   The two-part test is not stated as disjunctive.   *Bjustrom*

19   and *Lane* refer to the two-part test using the term "and," the

20   conjunctive, not "or."   The SAC alleges that services were

21   performed which meet the categories of services HUD considers

22   compensable.

23   Defendants move to dismiss the Sixth Cause of Action because

24   Plaintiffs' allegation in Paragraph 85 that "[t]he premium paid

25   by Flagstar to IGS was also illegal because it was not reasonably

26   related to the value of goods or services rendered" because the

allegations detailed above demonstrate that goods or services were rendered within the HUD Policy Statement of compensable services.

Plaintiffs respond that Defendants do not fully quote the allegations in Paragraph 85 which ends with the allegation that "no actual goods or services were rendered for the premium payment." Plaintiffs refer to the allegations in Paragraph 84 that the Bassetts paid, independently of the alleged yield spread premium, for every service they received from IGS. Plaintiffs contend:

> No service, real or imagined, remained unpaid by the Bassetts independent of the yield spread premium paid by Flagstar to IGS. Despite Flagstar's efforts to argue the contrary, the yield spread premium was payment 'solely for the fact that IGS tricked the Bassetts into signing loan documents for loans with higher interest rates than what the Bassetts qualified for and for including a prepayment penalty on one of the loans.'

Defendants reply that the allegations in Paragraph 85 are conclusory and belied by other allegations in the SAC. In addition, Defendants contend that the allegation that "no actual goods or services were rendered for the premium payment," is not the legal standard for a violation of RESPA. The question is whether the "yield spread premium is unreasonably high in relation to the goods and services provided by the mortgage broker." *Rendon*, *supra*.

The motions to dismiss the Sixth Cause of Action are DENIED on this ground; whether the alleged yield spread premium was

1  unreasonably high in relation to the goods and services performed
2  by the mortgage broker or whether goods or services were in fact
3  rendered for the alleged yield spread premium are alleged and
4  present factual questions to be resolved at summary judgment or
5  trial.

6      3.  <u>Seventh Cause of Action for Violation of TILA, 15</u>
7  <u>U.S.C. § 1601 *et seq.*</u>

8      Defendants move to dismiss the Seventh Cause of Action for
9  violation of the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601
10 *et seq.* on the grounds that lack of disclosure of an alleged
11 yield spread premium on the TILA disclosure form is not a
12 violation of TILA and Plaintiffs have not alleged facts
13 sufficient to show that Flagstar can be held liable under TILA as
14 either a creditor or assignee of the mortgages.

15     "The declared purpose of TILA is 'to assure a meaningful
16 disclosure of credit terms so that the consumer will be able to
17 compare more readily the various credit terms available to him
18 and avoid the uninformed use of credit, and to protect the
19 consumer against inaccurate and unfair credit billing and credit
20 card practices.'  15 U.S.C. § 1601(a).  Consequently, TILA
21 mandates that creditors provide borrowers with clear and accurate
22 disclosures of borrowers' rights, finance charges, the amount
23 financed, and the annual percentage rate.  *See, e.g.,* 15 U.S.C.
24 §§ 1632, 1635, 1638."  *Brewer v. Indymac Bank*, 609 F.Supp.2d
25 1104, 1114 (E.D.Cal.2009).

26     The Seventh Cause of Action, after re-alleging Paragraphs 1-

40, alleges that Defendants provided Plaintiffs with Truth in Lending disclosure forms required by 15 U.S.C. § 1604(b) and 12 C.F.R. § 226.17 on December 21, 2006; that, unbeknowst to Plaintiffs, the forms provided did not disclose a yield spread premium paid by Flagstar to IGS; and that, "[a]s a proximate result of defendants' failure to provide the Bassetts with accurate Truth in Lending disclosures, the Bassetts were wrongfully induced to enter into the loan transaction, and have incurred significant damages in an amount to be determined at trial."

### a.   Lack of Disclosure.

Defendants assert that the Seventh Cause of Action fails to state a claim upon which relief can be granted because TILA and its implementing regulations do not require lenders to disclose a yield spread premium as part of a loan's finance charge or to explain its impact on a loan's interest rate. *See Hernandez v. Downey Savings and Loan Ass'n*, 2009 WL 704381 at *7-8 (S.D.Cal., March 17, 2009):

> Given that federal law exclusively governs Downey's loan disclosures, the next question is whether federal law requires disclosure of a YSP's effects on a borrower's interest rate. Although the Ninth Circuit has not addressed this issue, other persuasive authority indicates TILA and its implementing regulations do not require lenders to disclose a YSP as part of a loan's finance charge or to explain its impact on a loan's interest rate.
>
> TILA requires lenders to disclose finance charges, 15 U.S.C. § 1632(a). Under TILA, borrower-paid mortgage broker fees qualify as

finance charges, whether those fees are paid
directly to the broker, or paid directly to
the lender for delivery to the broker.  12
C.F.R. § 226.4(a)(3); 15 U.S.C. § 1605(a)(6).
However, the Federal Reserve Board has
clarified that fees paid 'to a broker as a
"yield spread premium" that are already
included in the finance charge, either as
interest or as points, should not be double
counted' on the TILA Disclosure Statement.
61 F.R. 26126, 26127 (1996); 61 F.R. 49237,
49238-49239 (1996); *Stump v. WMC Mortg.
Corp.*, ... 2005 WL 645238 (E.D.Pa. Mar. 16,
2005).  *See also In re Meyer*, 379 B.R. 529,
544 (Bankr.E.D.Pa.2007)('Although the yield
spread premium serves to increase the rate of
interest, a lender is not required to break
down the components of the finance charge to
disclose the separate existence of the yield
spread premium as a component of the finance
charge.'); *Noel v. Fleet Fin., Inc.*, 34
F.Supp.2d 451, 457 (E.D.Mich.1998)(under
TILA, a lender is not required to break down
the components of the finance charge to
disclose the separate existence of a yield
spread premium).

Here, Downey disclosed the amount of the YSP,
and that amount was added to the total loan
amount, to be paid as part of the interest on
the loan; the YSP was therefore included in
the loan's finance charge.  As such, Downey
was not required to disclose the separate
existence of the YSP.  Plaintiff has not
shown that Downey failed to make a disclosure
that warrants rescission of the note or deed
under federal law.

Defendants refer to Paragraphs 89-90 of the SAC alleging that

Defendants did not disclose the YSP on the TILA Disclosure Forms,

and contend, based on this authority that Plaintiffs have not

stated a claim for violation of TILA.

     Plaintiffs respond that TILA does not require the separate

disclosure of a yield spread premium as long as the yield spread

premium is disclosed.  Plaintiffs contend that *Hernandez* is

distinguishable because the yield spread premium was disclosed; it was the effect of the yield spread premium that was not disclosed.  Plaintiffs contend that the SAC does not allege that Defendants failed to separately disclose the yield spread premium, but rather that the yield spread premium was not disclosed at all.  In addition, Plaintiffs refer to Paragraphs 13 of the SAC as alleging that Ruggles indicated that IGS would not receive any fees from the lender - "On the GFE, Ruggles identified IGS as the loan broker and indicated that IGS would not be paid any additional compensation by the lender."

Defendants reply that Plaintiffs' contention that the yield spread premium was not disclosed at all does not save the Seventh Cause of Action.  Defendants cite *Rivers v. Credit Suisse Boston Financial Corp.*, 2007 WL 1038567 at *5 (D.N.J., March 30, 2007):

> The defendants did not violate TILA by failing to disclose the yield spread premium because it is not a 'material disclosure' or an item required for inclusion in the finance charge under TILA.  The yield spread premium is excluded from the finance charge and not included in the points and fees calculation. *Stump v. WMC Mortg. Corp.,* ... 2006 WL 645238, * 4 (E.D.Pa. Mar. 16, 2005); *Balko v. Carnegie Fin. Group*, 348 B.R. 684, 693 n.11 (Bankr.W.D.Pa.2006)(rejecting plaintiffs' argument that the lender had a duty to separately disclose the yield spread premium).  'While the [yield spread premium] is a finance charge, the Federal Reserve Board has concluded that it should not be disclosed as a pre-paid finance charge pursuant to 15 U.S.C. § 1605(a)(6) because it is already included in the interest rate ... either as interest or as points' and 'should not be double counted.'  *Oscar v. Bank One,* ... 2006 WL 401853, at *5 (E.D.Pa., Feb. 17, 2006)(holding that the yield spread premium

26

was properly excluded from the pre-paid
finance charge in the TILA disclosure
statement given to plaintiffs).

The Court concludes that plaintiffs' argument
that 'The Yield Spread Premium that CSFC
demanded from the [plaintiffs] should have
been included in the finance charge
disclosures' is squarely contradicted by the
relevant case law and without merit because
defendant was not required to include the
yield spread premium as part of the pre-paid
finance charge.

At the hearing, Plaintiffs argued that the alleged yield

spread premium at issue here reflected "the higher interest rate

and the prepayment penalty."  Plaintiff argues that the cases

cited by Defendants are distinguishable:

Well, here, in this case, the yield spread
premium is reflected in the higher interest
rate and a prepayment penalty as well.  And
that should have been disclosed.  There's no
way to calculate the fee charged because of a
prepayment penalty.  And to this date, we
still don't know what fee, what portion of
the yield spread premium relates to the - to
the prepayment penalty.

So this case is different than the Hernandez
case and all those other cases on which the -
which state that the yield spread premium,
it's not necessary to disclose a yield spread
premium when it's reflected in the higher
interest rate.

Plaintiffs' arguments are without merit.  Plaintiffs

conceded at the hearing that the alleged YSP is reflected in the

higher interest rate and in the prepayment penalty.  The

allegations in the SAC that the YSP was not separately disclosed

in violation of TILA does not state a claim upon which relief can

be granted.  Plaintiffs' assertion that the YSP attributable to

27

the prepayment penalty cannot be calculated and therefore is required to be disclosed under TILA was made without citation to authority and none has been found.

Defendants' motion to dismiss the Seventh Cause of Action based on lack of disclosure of the alleged yield spread premium is GRANTED and the Seventh Cause of Action is DISMISSED WITH PREJUDICE.[2]

### 4.   Standing of Christy Bassett.[3]

Defendants move to dismiss the Sixth Cause of Action as to Christy Bassett on the ground that she lacks standing to bring this claim.[4]   Defendants assert that Christy Bassett did not apply for the loans and was not a party to the loan transaction. They refer to the allegation in Paragraph 26 and to Flagstar's request for judicial notice of Exhibit 3 that the note was executed solely by Robert Bassett and only lists Robert Bassett as the borrower.   Defendants also refer to Paragraph 21 wherein it is alleged that the Wholesale Commitment Letter was addressed to Robert Bassett.

"'To satisfy Article III's standing requirements, a

_____

[2]This conclusion makes unnecessary resolution of Flagstar's contentions that the SAC fails to allege sufficient facts showing that Flagstar is liable under TILA as either a creditor or an assignee.
[3]Because Article III standing impacts subject matter jurisdiction, it can be raised at any time. *See Oregon v. Legal Services Corp.*, 552 F.3d 965, 969 (9th Cir.2009).
[4]Defendants also moved to dismiss the Seventh Cause of Action on this ground.   Because the Seventh Cause of Action is dismissed with prejudice, it is unnecessary to address Christy Bassett's standing to assert the Seventh Cause of Action.

plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Citizens v. Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 969 (9th Cir.2003).  "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for '"each form of relief sought"'" *Oregon v. Legal Services Corp.*, 552 F.3d 965, 969 (9th Cir.2009). "The plaintiff bears the burden of proof to establish standing 'with the manner and degree of evidence required at the successive stage of the litigation.'" *Id.*

As to the Sixth Cause of Action for violation of RESPA, Defendants assert that a private right of action is also limited. Defendants cite 12 U.S.C. § 2607(d)(2):

> Any person or persons who violate the provisions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

Defendants argue that because Christy Bassett was not a party to the loan transaction, she was not the person charged for the settlement service and, therefore, lacks standing to pursue this claim.

Plaintiffs respond that Paragraphs 12-14, 18-21 and 25, specifically include Christy Bassett "in all parts of the loan

transaction."  Plaintiffs further contend that they do not concede that the Wholesale Commitment Letter was addressed solely to Robert Basset with no mention of Christy Bassett.  However, at the hearing, Plaintiffs conceded that Christy Bassett is not a signer on the note.

Although involving factual issues, because it also involves standing, Plaintiffs are required to allege the factual basis for Christy Bassett's standing to pursue the Seventh Cause of Action

Again, because the issue involves standing and because Christy Bassett did not sign the notes, Plaintiffs are required to amend to allege the specific facts upon which they rely in asserting that Christy Bassett has standing to pursue the Sixth Cause of Action.

Defendants' motion to dismiss the Sixth Cause of Action as brought by Christy Bassett is GRANTED WITH LEAVE TO AMEND.

5.  Preemption of State Law Causes of Action.

Flagstar moves to dismiss the state law causes of action for fraud, conspiracy to breach fiduciary duty, and violations of Section 17200 on the ground that these causes of action are preempted by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461 *et seq.*

In the September 14 Memorandum Decision, the Court dismissed the state law claims against Flagstar with prejudice to the extent the causes of action were based on the alleged nondisclosure of the yield spread premium or the payment of the yield spread premium.  The September 14 Memorandum Decision

30

granted Flagstar's motion to dismiss the state law claims with leave to amend "to the extent that these causes of action are based on the alleged fraudulent misrepresentations or breaches of fiduciary duty by Ruggles and/or IGS in inducing Plaintiffs to enter into a loan which had an interest rate higher than Plaintiffs qualified for."  The Court ruled: "In granting leave to amend, whether these claims are preempted by HOLA is deferred for later decision."

The Third Cause of Action is for fraud against Flagstar and Ruggles.  After incorporating Paragraphs 1-40, the Third Cause of Action alleges:

> 56.  In conjunction with the agreement between Flagstar and IGS to avoid disclosing the premium that would be paid by Flagstar to IGS, Flagstar was aware of and controlled all documents and information provided to the Bassetts by IGS.  Accordingly, Flagstar knew that in November and December of 2006, Michael Ruggles represented to the Bassetts both orally and in writing that IGS was acting as a loan broker for the Bassetts and that IGS would act as a fiduciary for the Bassetts.

> 57.  Flagstar, Zamani and IGS authorized said representations and Michael Ruggles made said representations to the Bassetts for the purpose of inducing the Bassetts to trust Ruggles and give him their confidence.

> 58.  At the time that the representations were made, Flagstar, Zamani, IGS and Ruggles knew that neither Ruggles nor IGS would carry out their fiduciary duties to the Bassetts.

> 59.  The Bassetts relied on said representations in trusting IGS, Zamani and Ruggles.

> 60.  The Bassetts were harmed in their trust

31

of IGS, Zamani and Ruggles because the
Bassetts were tricked into signing documents
for a loan that was misrepresented to them
and that was above par.

The Fifth Cause of Action is for conspiracy to breach fiduciary

duties against Flagstar and Ruggles.  After incorporating

Paragraphs 1-40 and 55-61, the Fifth Cause of Action alleges:

71.  Between November 29, 2006 and December
6, 2006, IGS, Ruggles, Zamani and Flagstar
entered into an agreement through which IGS,
Ruggles and Zamani would act on Flagstar's
behalf against the interests of the Bassetts
with respect to the Loans.

72.  At the time that Defendants entered into
said agreement, Defendants knew that Ruggles
had already conveyed to the Bassetts both
orally and in writing that IGS would act as a
fiduciary for the Bassetts in obtaining the
Loans.

73.  At the time that Defendants made this
agreement, Flagstar knew or should have known
that IGS, Zamani and Ruggles would be
required to breach their fiduciary duties to
the Bassetts in order to induce the Bassetts
to enter into a loan which had an interest
higher [sic] than the Bassetts qualified for.
Flagstar also knew or should have known that
IGS, Zamani and Ruggles would be required to
breach their fiduciary duties to the Bassetts
in order to hide the payment of a yield
spread premium.

74.  Pursuant to this agreement, Ruggles,
Zamani, and IGS breached their fiduciary
duties to the Bassetts as alleged above.

The Ninth Cause of Action is for unfair business practices

against Flagstar and Ruggles in violation of California Business

and Professions Code §§ 17200.  After incorporating all preceding

allegations, the Ninth Cause of Action alleges:

99.  In doing the things alleged above,

> defendants engaged in unlawful and fraudulent
> business practices within the meaning of
> Business and Professions Code section 17200
> et seq.
>
> 100.  More specifically, in the course of
> conducting their respective business
> practices, defendants have participated
> together in deceiving the Bassetts and
> inducing them to enter the loan transaction
> under the false pretense that IGS was acting
> in a fiduciary capacity on behalf of the
> Bassetts.  Additionally, under false
> pretenses, the Defendants induced the
> Bassetts to sign loan documents that
> contained terms that were different than the
> terms previously represented to the Bassetts.
> And, under false pretenses, the Defendants
> induced the Bassetts to sign loan documents
> with interest rates higher than what the
> Bassetts qualified for.  Also, defendants
> IGS, Zamani and Ruggles have participated in
> making and receiving a payment that violates
> the provisions of 12 U.S.C. section 2607, and
> in failing to disclose said payment to the
> Bassetts.

Congress enacted HOLA "to charter savings associations under federal law," *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 559 (9th Cir.2002), *cert. denied*, 538 U.S. 1069 (2003), and "to restore public confidence by creating a nationwide system of federal savings and loan associations to be centrally regulated according to nationwide 'best practices,'" *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 160-161 (1982).  HOLA and its regulations are a "radical and comprehensive response to the inadequacies of the existing state system," and "so pervasive as to leave no room for state regulatory control."  *Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1257, 1260 (9th Cir.1979), *aff'd*, 445 U.S.

33

921 (1980).  "[B]ecause there has been a history of significant federal presence in national banking, the presumption against preemption of state law is inapplicable."  *Bank of America, id.,* 309 F.3d at 559.

Through HOLA, Congress gave the Office of Thrift Supervision ("OTS") broad authority to issue regulations governing thrifts. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1005 (9th Cir.2008); 12 U.S.C. § 1464.  OTS promulgated 12 C.F.R. § 560.2 as a preemption regulation, which "'has no less preemptive effect than federal statutes.'" *Silvas, id.,* 514 F.3d at 1005.

Section 560.2(a) provides:

> OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA.  To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations.  OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.  Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) or § 560.10 of this part.  For purposes of this section, 'state law'

34

> includes any state statute, regulation, ruling, order, or judicial decision.[5]

Section 560.2(b) provides:

> Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:
>
> ...
>
> > (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
>
> > (5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;
>
> > (6) Escrow accounts, impound accounts, and similar accounts;
>
> ...
>
> > (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

---

[5]12 C.F.R. § 560.110 pertains to "most favored lender usury preemption" and has no apparent relevance to this action.

35

                          **(10) Processing, origination,
                          servicing, sale or purchase of, or
                          investment or participation in,
                          mortgages**

               **....**

**Section 560.2(c) provides:**

               **State laws of the following types are not
               preempted to the extent that they only
               incidentally affect the lending operations of
               Federal savings associations or are otherwise
               consistent with the purposes of paragraph (a)
               of this section:**

               **...**

                          **(4) Tort law**

               **....**

     **As noted by the Ninth Circuit in *Silvas*, 514 F.3d at 1005,
OTS has outlined a proper analysis in evaluating whether a state
law is preempted under Section 560.2:**

               **When analyzing the status of state laws under
               § 560.2, the first step will be to determine
               whether the type of law in question is listed
               in paragraph (b).  If so, the analysis will
               end there; the law is preempted.  If the law
               is not covered by paragraph (b), the next
               question is whether the law affects lending.
               If it does, then, in accordance with
               paragraph (a), the presumption arises that
               the law is preempted.  This presumption can
               be reversed only if the law can clearly be
               shown to fit within the confines of paragraph
               (c).  For these purposes, paragraph (c) is
               intended to be interpreted narrowly.  Any
               doubt should be resolved in favor of
               preemption.**

**OTS, Final Rule, 61 Fed.Reg. 50951, 50966-50967 (Sept. 30, 1996).**

     **In *Silvas, supra*, 514 F.3d 1001, mortgage applicants filed a
putative class action in state court alleging that a federal**

36

savings and loan association's policy not to refund lock-in fees after applicants cancelled the transaction within the three-day window provided by TILA violated California's Unfair Competition Law.   The Ninth Circuit ruled:

> I *UCL § 17500: Unfair Advertising*
>
> As outlined by OTS, the first step is to determine if UCL § 17500, as applied, is a type of state law contemplated in the list under paragraph (b) of 12 C.F.R. § 560.2.   If it is, the presumption analysis ends.   Here, Appellants allege that E*TRADE violated UCL § 17500 by including false information on its website and in every media advertisement to the California public.   Because this claim is entirely based on E*TRADE's *disclosures and advertising*, it falls within the specific type of law listed in § 560.2(b)(9). Therefore, the presumption analysis ends. UCL § 17055 as applied in this case is preempted by federal law.
>
> II *UCL § 17200: Unfair Competition*
>
> Again, the first step is to determine if UCL § 17200, as applied, is a type of state law contemplated in the list under paragraph (b) of 12 C.F.R. § 560.2.   Appellants allege E*TRADE's practice of misrepresenting consumer's legal rights in advertisements and other documents is contrary to the policy of California and thus violates UCL § 17200. This claim, similar to the claim under § 17500, fits within § 560.2(b)(9) because the alleged misrepresentation is contained in advertising and disclosure documents.
>
> In addition, Appellants' claim under UCL § 17200 alleges that the lock-in fee itself is unlawful.   That allegation triggers a separate section of paragraph (b).   Section 560.2(b)(5) specifically preempts state laws purporting to impose requirements on loan related fees.   *See Jones v. E*Trade Mortgage Co.*, 397 F.3d 810, 813 (9th Cir.2005)(finding E*TRADE's lock-in fee is not a separate transaction, but a loan related fee).

> Because the UCL § 17200 claim, as applied, is
> a type of state law listed in paragraph (b) -
> in two separate sections - the preemption
> analysis ends there.  Appellants' claim under
> UCL § 17200 is preempted.

514 F.3d at 1006.  The Ninth Circuit then addressed the

incidental affect analysis under Section 560.2(c):

> Section 560.2(c) provides that state laws of
> general applicability only incidentally
> affecting federal savings associations are
> not preempted.  Appellants argue that both of
> their state law claims fit under §
> 560.2(c)(1) and (4) because they are founded
> on California contract, commercial, and tort
> law, merely enforcing the private right of
> action under TILA.  They further contend that
> their claims use a predicate legal duty
> supplied by TILA, and therefore only have an
> incidental affect on lending.

> We do not reach the question of whether the
> law fits within the confines of paragraph (c)
> because Appellants' claims are based on types
> of laws listed in paragraph (b) of § 560.2,
> specifically (b)(9) and (b)(5).[3]

> [3]If we did reach the issue, we would reach
> the same result.  When federal law preempts a
> field, it leaves 'no room for the States to
> supplement it.' ... When an entire field is
> preempted, a state may not add a damages
> remedy unavailable under the federal law ...
> An integral part of any regulatory scheme is
> the remedy available against those who
> violate the regulations ....

> In this case, it is clear that the UCL has a
> much longer statute of limitations than does
> TILA ... It is also clear that Appellants
> seek to take advantage of the longer statute
> of limitations under UCL to remedy TILA
> violations, because without the extended
> limitations period their claims would be
> barred.

> An attempt by Appellants to go outside the
> congressionally enacted limitation period of
> TILA is an attempt to enforce a state

regulation in an area expressly preempted by federal law.

*Id.* at 1006-1007.

To the extent that the state law claims against Flagship in the SAC are based on the alleged nondisclosure of the yield spread premium or the payment of the yield spread premium, these claims are preempted by HOLA as the Court ruled in the September 14 Memorandum Decision.  These causes of action are again DISMISSED WITH PREJUDICE to this extent.

Flagship argues that the state law claims based on the allegations of IGS' and Ruggles' misrepresentations to the Bassetts are also preempted by HOLA:

> The core allegations of each of these claims rests on alleged misrepresentations or disclosures that Ruggles and/or IGS made to the plaintiffs regarding their fiduciary duties to plaintiffs, which allegedly affected the terms of the credit contained in the loans:
>
> • In support of their *fraud* claim against Flagstar, plaintiffs allege that 'Flagstar knew that ... Michael Ruggles represented to the Bassetts both orally and in writing that IGS was acting as a loan broker for the Bassetts and that IGS would act as a fiduciary for the Bassetts.'  SAC ¶ 56.  The Bassetts say they relied on the representations to their detriment because the loan that 'the Bassetts were tricked into signing' was misrepresented to them and was 'above par.'  *Id.* ¶ 58.
>
> • With regard to the *conspiracy* claim against Flagstar, plaintiffs allege that the defendants 'entered into an agreement through which IGS, Ruggles and Zamani would act on Flagstar's behalf against the interests of the Bassetts with respect to the Loans' and that 'Flagstar knew or should have known that

IGS, Zamani and Ruggles would be required to breach their fiduciary duties to the Bassetts in order to induce them to enter into a loan which had an interest rate higher than the Bassetts qualified for.' SAC ¶¶ 71-73.

• In support of the *§ 17200* claim against Flagstar, plaintiffs allege that the defendants 'deceiv[ed] the Bassetts and induc[ed] them to enter the loan transaction under the false pretense that IGS was acting in a fiduciary capacity on behalf of the Bassetts,' 'induced the Bassetts to sign loan documents that contained terms that were different than the terms previously represented to the Bassetts,' and 'induced the Bassetts to sign loan documents with interest rates higher than what the Bassetts qualified for.' SAC ¶ 100.

Flagstar argues that these claims fall squarely within the scope of HOLA, which preempts claims related to the terms of credit, disclosures, and loan origination.

In response, Plaintiffs discuss only the Third Cause of Action for fraud. Plaintiffs do not assert that the Fifth or Ninth Causes of Action are not preempted under HOLA; consequently Plaintiff concedes that the Fifth and Ninth Causes of Action are preempted.

With regard to the Third Cause of Action, Plaintiffs contend that it is not based upon terms of credit, disclosures or loan origination, but, rather, is based on Ruggles' representation to the Bassetts that IGS was acting as a loan broker for the Bassetts and that IGS would act as a fiduciary for the Bassetts:

No case cited by Flagstar shows that HOLA preempts a fraud claim based upon a misrepresentation that was not about terms of credit, disclosures and loan origination. Flagstar's discussion is simply inapplicable.

1    Flagstar replies that three of the subsections of 12 C.F.R.

2   § 560.2(b) apply to preempt the Third Cause of Action, even if

3   the claim is based solely on "Ruggles' representation to the

4   Bassetts ... that IGS was acting as a loan broker for the

5   Bassetts and that IGS would act as a fiduciary for the Bassets:'

6            First, Ruggles' representations regarding
             whether IGS was the broker of the loans
7            implicates issues regarding the 'origination,
             ... sale or purchase of, or investment or
8            participation in, mortgages.'  12 C.F.R. §
             560.2(b)(10).  Second, his representations
9            qualify as disclosures regarding the loan,
             covered by § 560.2(b)(9). ... And, finally,
10           his representations affect the 'terms of
             credit' and whether IGS is the broker on the
11           loan.  12 C.F.R. § 560.2(b)(4).

12  Flagship further argues that preemption of the Third Cause of

13  Action is supported by case law because the Third Cause of Action

14  alleges that the Bassetts relied on Ruggles' misrepresentation

15  and were tricked into signing documents for a loan that was

16  misrepresented to them and was above par.  Flagship contends that

17  Plaintiffs' alleged reliance on Ruggles' misrepresentation, which

18  led to them entering into the loans at issue, place the Third

19  Cause of Action squarely within HOLA's preemption.  Flagstar

20  cites *Cosio v. Simental*, 2009 WL 201827 at * 5 (C.D.Cal. Jan. 27,

21  2009), wherein the District Court ruled that Plaintiffs' state

22  law claims for elder abuse and negligence were preempted by HOLA:

23           Like California's Unfair Competition Law,
             California's Elder Abuse and Dependent Civil
24           Protection Act and negligence law, on their
             face, do not appear to pertain to the lending
25           practices of federal savings associations.
             However, when the laws are analyzed in
26           relation to the particular circumstances of

41

this case, it becomes much more apparent that, as applied, they impose requirements on Wachovia that are already imposed on it by HOLA.  Consequently, they are preempted.

At their core, Plaintiffs' claims turn on the alleged fact that Simental and Sevillano convinced Plaintiffs to enter into 'complicated, risky and oppressive' loans ... Plaintiffs further allege that Simental and Sevillano failed to provide them with 'the terms, risks and consequences of that type of loan' and that Simental charged them fees 'for those oppressive refinances.' ... While Wachovia's role throughout this transaction is not entirely clear, Plaintiffs do broadly state that Wachovia 'assisted the other defendants in the taking of plaintiffs' monies and the encumbering of plaintiffs' properties with the unconscionable refinance loans by participating in the broker's conduct.' ... These allegations trigger several sections of § 560.2(b).  For instance, to the extent the terms of the loan are at issue, including amortization of loans and adjustments to the interest rate, § 560.2(b)(4) applies.  And to the extent the fees charged by Simental are at issue, § 560.2(b)(5) applies.  Lastly, to the extent that other defendants failed to properly disclose required information, § 560.2(b)(9) applies.

This Court recognizes that HOLA does not totally displace all state law.  However, where as here, a plaintiff alleges conduct that touches upon a defendant's lending practices, operations, and charges, the Court believes that Congress' intent to preempt the state laws can be inferred ....

In short, because the claims, as applied, turn on the types of state law listed in § 560.2(b), the preemption analysis ends there. Plaintiffs' elder abuse and negligence claims are preempted.

The Third Cause of Action is preempted by HOLA. The only purpose for the allegations that Ruggles misrepresented that IGS

was acting as a loan broker for the Bassetts and that IGS would act as a fiduciary for the Bassets pertains to the terms of the loan transaction; otherwise the allegation is totally irrelevant as to Flagstar.

Flagstar's motion to dismiss the Third, Fifth and Ninth Causes of Action as preempted by HOLA is GRANTED; the Third, Fifth and Ninth Causes of Action are DISMISSED WITH PREJUDICE as against Defendant Flagstar.[6]

### 6.   State Law Claims - Adequacy of Pleadings as to Ruggles.

Ruggles moves to dismiss the First, Second and Third Causes of Action for fraud for failure to state a claim:

> Plaintiffs fails [sic] to bring their allegations within the construct of fraud because there is no concealment of material fact because IGS did not broker the loan, it made the loan and sold the financing two weeks later to Flagstar.  There is no YSP, therefore there is no failure to disclose it, it cannot be a material fact nor can it be relied upon by the Plaintiffs.

As Plaintiffs respond, Ruggles ignores the actual allegations of the SAC.  Defendant Ruggles' motion to dismiss the First, Second and Third Causes of Action is DENIED.

B.   MOTION TO STRIKE.

Flagstar moves to strike the following allegations in the

---

[6] This conclusion makes unnecessary any discussion of Flagstar's motion to dismiss the Third and Fifth Causes of Action for failure to state a claim upon which relief can be granted and for failure to comply with Rule 9(b), Federal Rules of Civil Procedure.

SAC:

> • "In the alternative, the Bassetts demand rescission of the loan transaction."  SAC ¶ 91.

> • "For rescission of the loan transaction (if damages are unavailable or would be inadequate to remedy the Bassetts' injuries)."  SAC at 15:24-25.

> • "However, after Robert Bassett executed the note and it was notarized, outside of Robert Bassett's presence, Flagstar added 'Pay to the order of Flagstar Bank, FSB without recourse' to the note and Flagstar had IGS president and CEO, Zamani sign the conveyance.  Flagstar did not provide a copy of the note with the above conveyance language to the Bassetts."  SAC ¶ 26.

Rule 12(f) provides in pertinent part that the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored and infrequently granted. *Neveu v. City of Fresno,* 392 F.Supp.2d 1159, 1170 (E.D.Cal.2005).  A motion to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.  *Id.*  The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that might arise from litigating spurious issues by dispensing with those issues prior to trial.  *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds,* 510 U.S. 517 (1994).  A motion to strike may be used to strike any part of the prayer for relief when the recovery sought is unavailable as a matter of law.  *See Bureerong v. Uvawas,* 922

F.Supp. 1450, 1479 n. 34 (C.D.Cal.1996).

     1.  <u>Rescission</u>.

Defendants move to strike the allegation in Paragraph 91. At the hearing, Plaintiffs withdrew the rescission claim in the Second Amended Complaint.  Defendants' motion to strike Paragraph 91 IS DENIED AS MOOT.

Flagstar moves for the Court to award it attorney's fees and costs in having to bring this motion to strike based on Plaintiffs' "disregard for the Court's prior ruling regarding rescission."  Flagstar relies on 11-100, Local Rules of Practice:

> Failure of counsel or a party to comply with these Rules or with any order of the Court may be grounds for imposition by the Court of any and all sanctions authorized by statute or Rule or within the inherent power of the Court.

No basis for an award of attorneys' fees and costs exists; Defendants' request is DENIED.  The inclusion of the rescission claim in the Seventh Cause of Action was no doubt due to inattention by Plaintiffs' counsel.  Flagstar's interpretation of the September 14 Memorandum does not provide a basis for sanctions.

     2.  <u>Paragraph 26</u>.

Flagstar moves to strike the allegations in Paragraph 26, which Flagship characterizes as "newly asserted, and patently false, allegations of malfeasance."   To reiterate, Paragraph 26 alleges:

> In order to further their scheme of defrauding the Bassetts, Flagstar prepared

> the promissory note with IGS identified as
> the Lender.  However, after Robert Bassett
> executed the note and it was notarized,
> outside of Robert Bassett's presence,
> Flagstar added 'Pay to the order of Flagstar
> Bank, FSB without recourse' to the note and
> Flagstar had IGS president and CEO, Zamani
> sign the conveyance.  Flagstar did not
> provide a copy of the note with the above
> conveyance language to the Bassetts.

Flagstar asserts that the language "Pay to the order of

Flagstar Bank, FSB without recourse" is "clearly visible on the

face of the fully executed Note and Balloon Note for the two

relevant loans."  Flagstar requests the Court take judicial

notice of the notes attached as Exhibits 3 and 4 to their Request

for Judicial Notice.  Flagstar asserts that the language is also

clearly visible on the face of the "pre-signature copies of the

Note and Balloon Note that were produced by plaintiffs in this

litigation."  Flagstar requests the Court take judicial notice of

Exhibits 5 and 6 to its Request for Judicial Notice, which were

produced by Plaintiffs on May 11, 2009.  Flagstar argues:

> If the language was not added until 'after
> Robert Bassett executed the note and it
> was notarized,' the Bassetts could not have had
> and produced a pre-signature copy of the Note
> with the language already on it.  Moreover,
> if 'Flagstar did not provide a copy of the
> note with the above conveyance language to
> the Bassetts,' the Bassetts could not have
> produced a copy of the Note with the
> conveyance language on it to Flagstar.  In
> other words, on the face of the Notes and the
> unsigned copies of the Notes, the allegations
> in [Paragraph 26] are a fiction.

Because, Flagstar contends, Paragraph 26 accuses Flagstar of

actions that are demonstrably false, based on judicially

noticeable facts, the allegations should be stricken because they
are immaterial to this litigation and because their falsity
renders them "scandalous" under Rule 12(f).

Plaintiffs respond that Flagstar's argument is fallacious:

> It takes no special mental effort to identify
> the fallacies in Flagstar's train of logic.
> Flagstar presents no affidavits or
> declarations from those who were present at
> the signing by the Bassetts.  Flagstar has no
> direct evidence of any kind of what documents
> were presented to the Bassetts for signature.
> Moreover, Flagstar does not provide any
> declaration explaining how, when and why the
> subject language was added to the Bassetts'
> notes.
>
> Instead, Flagstar asks the Court to assume
> that the only way the Bassetts could have
> obtained an unsigned copy of the note with
> the offending language is if it were given to
> them at signing.  Additionally, Flagstar asks
> this Court to assume that if the offending
> language is on one copy of the unsigned note,
> then it is on all copies of the unsigned
> note.  There is simply no basis for the Court
> to make the assumptions that Flagstar would
> have it make.

Plaintiffs further assert that the allegation is material:

> The subject language helps demonstrate the
> lengths that Flagstar and IGS went to hide
> their scheme.  The language helps explain why
> Flagstar and IGS refused to answer the
> Bassetts' requests about what kickbacks
> Flagstar paid to IGS.  The language also
> helps establish that Flagstar and IGS were
> working together to keep the true information
> about their loan from the Bassetts.

Defendants' request for judicial notice and the motion to
strike are DENIED.  The facts are disputed.

### CONCLUSION

For the reasons stated:

47

1.   **Defendants Flagstar and Ruggles' motions to dismiss are GRANTED IN PART WITH PREJUDICE, GRANTED IN PART WITH LEAVE TO AMEND, AND DENIED IN PART;**

2.   **Defendant Flagstar's motion to strike is DENIED;**

3.   **Plaintiffs shall file a Third Amended Complaint in accordance with the rulings in this Memorandum Decision and Order within 20 days from the filing date of this Memorandum Decision and Order.**

IT IS SO ORDERED.

**Dated:    April 15, 2010                              /s/ Oliver W. Wanger**
                                        UNITED STATES DISTRICT JUDGE